UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

In re PLY GEM HOLDINGS INC.,          :     Civil Action No. 14-CV-3577 (JPO)
SECURITIES LITIGATION                 :
                                      :     CLASS ACTION
————————————————————        :
                                      :
This Document Relates To:             :
                                      :
        ALL ACTIONS.                  :
                                      :
                                      :
———————————————————— x

**CONSOLIDATED AMENDED COMPLAINT**

Lead Plaintiff The Strathclyde Pension Fund ("Strathclyde" or "Lead Plaintiff") makes the following allegations based upon the investigation undertaken by its counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings made by Ply Gem Holdings, Inc. ("Ply Gem" or the "Company"), as well as securities analysts' reports and advisories, press releases, media reports and other public statements issued by or about the Company and information provided to Lead Plaintiff's counsel by former Ply Gem employees and other individuals with direct knowledge of Ply Gem's business activities. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons or entities who purchased the common shares of Ply Gem in and/or traceable to the Company's initial public offering of common stock on or about May 23, 2013 (the "IPO") seeking to pursue remedies under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act").

2.      Defendant Ply Gem is a manufacturer of exterior building products for the residential and commercial construction, do-it-yourself, and professional remodeling and renovation markets, whose products are primarily sold in the United States and Canada.

3.      On May 22, 2013, the SEC declared effective Ply Gem's Form S-1 registration statement, as amended, which incorporated a prospectus (the "Registration Statement"), offering to sell 18,157,895 Ply Gem common shares (including 2,368,421 common shares pursuant to overallotment options issued to the Company's underwriters) to the public at a proposed price of $20.00 per share.

4.      On May 23, 2013, Ply Gem sold 18,157,895 shares of common stock to the public in the IPO at a price of $21.00 per share and received net proceeds of approximately $353.4 million

therefrom.  Following the IPO, Ply Gem common stock was listed and traded under the symbol "PGEM" on the New York Stock Exchange ("NYSE").

5.      The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact and omitted to disclose material information which was required to be disclosed pursuant to the regulations governing its preparation.

6.      Specifically, the Registration Statement failed to disclose the financial impact of a supply agreement between Ply Gem and The Home Depot, Inc. ("Home Depot").  In late 2012, Ply Gem and Home Depot entered into a supply agreement (the "HD Supply Agreement"), under which Ply Gem agreed to manufacture and supply windows to approximately 300 Home Depot stores in its Texas, Oklahoma, Louisiana and Arkansas markets.  In connection with the HD Supply Agreement, Ply Gem was required to, and did, purchase a certain amount of Home Depot's existing window inventory.  Following its purchases, Ply Gem either junked the windows or sold them at greatly reduced prices, causing it to experience significant losses on the windows.  The Registration Statement, however, failed to disclose that Ply Gem was then experiencing material losses on the disposal of the windows purchased from Home Depot.

7.      In addition, under the HD Supply Agreement, Ply Gem was to sell Home Depot a large volume of low-margin aluminum windows.  This initial sale of low margin windows to Home Depot had a material adverse impact on Ply Gem's second quarter operating results, since a high percentage of the Company's incremental sales during the quarter were heavily weighted with low margin products.  The Registration Statement failed to disclose that Ply Gem was earning little, if any profit, on the initial deliveries of windows to Home Depot under the HD Supply Agreement, which, in turn, was then having a material adverse effect on the Company's profit margins.

8.      Furthermore, the HD Supply Agreement also provided that Ply Gem was to manufacture and sell vinyl windows to Home Depot.  By the time of the IPO, as detailed further herein, Ply Gem experienced significant, on-going operational inefficiencies associated with the ramping of Ply Gem's process to manufacture the vinyl windows to be sold to Home Depot, which caused the Company to incur material costs.  The Registration Statement failed to disclose the production problems and the increased costs that the Company was then experiencing.

9.      Finally, at the time of the IPO, Ply Gem was experiencing declining sales of siding due to customers' high inventory levels.  At the time of the IPO, Defendants knew that siding customers had experienced poor sales in March 2013, were over-inventoried with products and that, as a result, these customers had greatly reduced their purchases in April and May 2013 and would be reducing future purchases.  The Registration Statement, however, failed to disclose this negative trend.

10.     At the time of the filing of the initial action in this consolidated case, Ply Gem stock traded at $11.83 per share, a 44% decline from the IPO price.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].

12.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v] and 28 U.S.C. §1331.

13.     Venue is properly laid in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. §§1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District, as the IPO was marketed in this District.  In addition, certain of the Underwriter Defendants, defined below, maintain their executive offices in this District.

14.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the NYSE, a national stock exchange located in this District.

## PARTIES

15.     Lead Plaintiff, as set forth in its certification previously filed with this Court and incorporated by reference herein, purchased Ply Gem common shares in and traceable to the IPO and was damaged thereby.

16.     Defendant Ply Gem manufactures and sells residential and commercial building products primarily in the United States and Canada.

17.     Defendant Gary E. Robinette ("Robinette") served as Ply Gem's President, Chief Executive Officer and a Director (as Vice Chairman of Ply Gem's Board of Directors) at the time of the IPO.

18.     Defendant Shawn K. Poe ("Poe") served as Ply Gem's Vice President, Chief Financial Officer, Treasurer and Secretary at the time of the IPO.

19.     Defendant Frederick J. Iseman ("Iseman") served as a Ply Gem Director (as Chairman of Ply Gem's Board of Directors) at the time of the IPO.

20.     Defendants Robert A. Ferris ("Ferris"), Steven M. Lefkowitz ("Lefkowitz"), John D. Roach ("Roach"), Michael P. Haley ("Haley"), Timothy T. Hall ("Hall") and Jeffrey T. Barber ("Barber") each served as Directors of Ply Gem at the time of the IPO.

21.     Defendants Robinette, Poe, Iseman, Ferris, Lefkowitz, Roach, Haley, Hall and Barber are collectively referred to herein as the "Individual Defendants."  Each of the Individual Defendants signed the Registration Statement.

22.     Defendants J.P. Morgan Securities LLC ("J.P. Morgan"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), Goldman, Sachs & Co. ("Goldman Sachs") acted as underwriters, joint book-running managers and representatives of the underwriters in connection with the IPO.

23.     Defendants UBS Securities LLC ("UBS"), Deutsche Bank Securities Inc. ("Deutsche Bank"), Zelman Partners LLC ("Zelman"),  BB&T Capital Markets, a division of BB&T Securities, LLC ("BB&T") and Stephens Inc. ("Stephens") acted as underwriters in connection with the IPO.

24.     Defendants J.P. Morgan, Credit Suisse, Goldman Sachs, UBS, Deutsche Bank, Zelman, BB&T and Stephens are collectively referred to herein as the "Underwriter Defendants." The Underwriter Defendants participated in the drafting and dissemination of the Registration Statement and collectively received discounts and commissions of approximately $25.4 million in connection with the IPO.

25.     The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement was prepared properly, accurately and free from misstatements or omissions of material fact.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

26.     Defendant Ply Gem, the Individual Defendants and the Underwriter Defendants are collectively referred to herein as "Defendants."

## CLASS ACTION ALLEGATIONS

27.     Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of itself and all persons or entities who purchased the common shares of Ply Gem in and/or traceable to the IPO (the "Class") that were damaged thereby. Excluded from the Class are Defendants named herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity

in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

28.     The members of the Class are so numerous that joinder of all members is impracticable.  Ply Gem issued 18,157,895 of its common shares in the IPO.  The precise number of members in the Class is unknown to Lead Plaintiff at this time but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of Ply Gem, its transfer agent or the underwriters of the IPO.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

29.     Lead Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Lead Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

30.     Lead Plaintiff's claims are typical of the claims of the other members of the Class because Lead Plaintiff and all the Class members' damages arise from and were caused by the same materially false representations and/or omissions made by or chargeable to Defendants.  Lead Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

31.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged.  Lead Plaintiff knows of no

difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether the Registration Statement issued by Defendants to the investing public in connection with the IPO negligently omitted and/or misrepresented material facts about Ply Gem and its business; and

(c)     the extent of the injury sustained by members of the Class and the proper measure of damages.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

33.     Defendant Ply Gem, together with its subsidiaries, manufactures residential and commercial building products for sale primarily in the United States and Canada.  The Company utilizes a multi-channel distribution network that serves both the new construction and the home repair and remodeling markets via a broad customer base of specialty and wholesale distributors, retail home centers, lumberyards, builders and remodeling dealers.

34.     Ply Gem conducts its operations via two business segments: the Siding, Fencing and Stone ("SF&S") segment; and the Windows and Doors ("W&D") segment.

35.     The SF&S segment, which primarily focuses on the home repair and remodeling market, manufactures and sells a comprehensive line of vinyl and stone veneer products.  The principal products sold by the SF&S segment include vinyl siding and skirting, vinyl and aluminum

soffit, aluminum trim coil, various trim and moldings, rain removal systems, designer accents such as shakes, shingles, scallops, shutters, vents and mounts, vinyl fencing, vinyl and composite railing and stone veneer.

36.     The W&D segment manufactures and sells a variety of vinyl, aluminum and wood windows and patio doors, and steel, wood and fiberglass entry doors.  Although the W&D segment has historically targeted the new construction market (as opposed to the repair and remodeling market), by the time of the IPO Ply Gem had started expanding its presence in the home repair and remodel window sector by launching a new series of repair and remodel window products.

37.     At the time of the IPO, the SF&S and W&D segments accounted for approximately 54% and 46% of the Company's sales, respectively.

38.     Prior to the IPO, Ply Gem had accumulated a large amount of debt, with total liabilities of $1.249 billion exceeding its total assets of $906 million by $343 million on March 30, 2013.  Ply Gem's long-term debt at March 31, 2013, accounted for the lion share of its total liabilities on that date, consisting largely of 9.375% Senior Notes maturing on April 15, 2017 and 8.25% Senior Secured Notes maturing on February 15, 2018 (the "Senior Notes").

39.     The indenture governing the Senior Notes subjected Ply Gem to the informational reporting requirements of the Securities Exchange Act of 1934 (the "Exchange Act").  Accordingly, prior to its IPO, Ply Gem filed annual, quarterly and current reports with the SEC.

**The HD Supply Agreement**

40.     In late 2012, Ply Gem and Home Depot entered into the HD Supply Agreement, whereby Ply Gem agreed to manufacture and supply windows to approximately 300 Home Depot stores in its Texas, Oklahoma, Louisiana and Arkansas markets.  The HD Supply Agreement was material to Ply Gem's 2013 operations, as it was expected to provide the Company with $40 million to $50 million of incremental business.

41.     **Buyback of Home Depot Window Inventory**: Unbeknownst to investors, the HD Supply Agreement obligated Ply Gem to "buyback" a certain amount of Home Depot's existing window inventory, which Home Depot had purchased from American Craftsman (an Andersen Corporation), another window manufacturer.  During the months prior to the IPO, Ply Gem paid Carter Logistics to transport the windows to a Company warehouse on La Reunion Parkway in Dallas, Texas (the "La Reunion warehouse").  The magnitude of windows purchased by Ply Gem from Home Depot was such that Ply Gem's La Reunion warehouse received approximately five to six tractor trailer loads of windows per day, seven days per week.

42.     Ply Gem agreed to purchase window inventory from Home Depot so that it could obtain the shelf space previously occupied by the American Craftsman windows at Home Depot store locations.

43.     At the time of the IPO, Ply Gem had sustained material undisclosed losses on the windows it purchased from Home Depot.  After Ply Gem purchased the windows from Home Depot, they were discarded in garbage dumpsters or auctioned to inventory liquidators at very steep discounts to retail prices.  The number of windows scraped by Ply Gem was such that the Company had difficulty procuring dumpsters sufficient to accommodate the amount of windows that were being discarded at the La Reunion warehouse.  In addition to the cost of the windows, Ply Gem incurred material costs associated with transportation, warehousing and labor necessary to process the windows it purchased from Home Depot.

44.     As a result of the foregoing, at the time of the IPO, Ply Gem had incurred material losses on windows it agreed to buy from Home Depot pursuant to the HD Supply Agreement.

45.     After the IPO, on August 13, 2013, when Ply Gem announced its financial results for the 2013 fiscal second quarter, the period ended June 29, 2013 ("Q2"), the Company held a

conference call with analysts and investors (the "Q2 conference call") to discuss its Q2 operations. During the conference call, Defendant Robinette quantified the adverse Q2 impact ensuing from the Home Depot window buyback, stating, in pertinent part, as follows:[1]

> . . . I guess the one thing I would add too to clarify on it is during the quarter, we did have a buyback, if you will, associated with that new customer win, which is really a one-time cost **that does affect the margins on the quarter by about a full, a little over a full 100 basis points.  So it represents about 20% to 25% of that margin compression in the Window and Door segment** and that would not be an ongoing type thing.

46.     **Low-Margin Aluminum Window Sales**: In addition to the buyback of certain of Home Depot's existing window inventory, Ply Gem initially sold to Home Depot a large volume of low-margin aluminum windows pursuant to the HD Supply Agreement.  The initial sale of low margin windows to Home Depot also had a material adverse effect on Ply Gem's Q2 operating results, since a high percentage of the Company's incremental sales during the quarter were heavily weighted with low margin products.

47.     During the Q2 conference call, Defendants Poe and Robinette noted that low margin aluminum windows sold to Home Depot adversely impacted the Company's Q2 profitability, stating, in pertinent part, as follows:

Defendant Poe:

> The inefficiencies associated with ramp up costs, and that's really the volume increases we talked about **and specifically on our aluminum windows, where the volumes were up 100%** and overall our windows being up call it 50% in the US. That drove, call it something in the $8 million range of negative impact.  And it's not just deficiencies, it impacts -- they're tied together in that there's a mix component of it, Michael, and if **that increase in volume was skewed towards our lower earned value product, some of it was specific to a new customer that rolled out during the first half of the year**, and the rollout -- **their initial rollout was on their lower margin, the lower margin product**, and then in the second half of the year we'll be rolling out the higher margin product.  **And that was Home Depot who we picked up coming into this year and that we're rolled out in the second half.**

---

[1]       Unless otherwise noted, all emphasis herein is added.

Defendant Robinette:

. . . the first part of the [Home Depot] rollout was **the low end aluminum [windows], and I do mean low end, okay.  So it really played havoc with our mix**.

48.    **Vinyl Window Manufacturing Problems**: Also prior to the IPO, Ply Gem initiated processes to manufacture vinyl windows for Home Depot at its plant in Dallas, Texas.  These vinyl windows, which were also sold to Home Depot at a low profit margin, were scheduled to be shipped to Home Depot after it purchased the initial sales of low-margin, aluminum windows.  As noted below and unbeknownst to investors, prior to the IPO, Ply Gem had experienced significant, on-going operational inefficiencies associated with the ramping of Ply Gem's process to manufacture the vinyl windows to be sold to Home Depot, which caused the Company to incur material, but undisclosed, costs.

49.    In late 2012, Ply Gem began converting an existing warehouse on French Settlement Road in Dallas, Texas to a manufacturing plant (the "Dallas Plant") where it was to make vinyl windows for, among others, Home Depot.  From the on-set, the conversion of the pre-existing warehouse was dysfunctional, resulting in the Dallas Plant being behind schedule and millions of dollars over budget.

50.    Under pressure to meet manufacturing deadlines, the Dallas Plant began operating prior to securing requisite occupancy approvals from local authorities and without necessary manufacturing equipment.  The operational inefficiencies at the Dallas Plant amplified the costs associated with the production of the vinyl windows to be manufactured for Home Depot.  For example, without the necessary equipment to fabricate glass window panes, the Company was forced to buy window panes from Cardinal Glass Industries at a steep premium to Ply Gem's cost to fabricate.

51.     In addition, when Ply Gem began manufacturing the vinyl windows for Home Depot, it utilized a new workforce of relatively inexperienced employees.  As a result, the Dallas Plant produced a large volume of defective windows, including windows without National Fenestration Rating Council energy performance labeling, windows without Low E film, windows without grids, and other manufacturing defects.

52.     The inefficiencies associated with the conversion of the Dallas Plant and the ramping of Ply Gem's processes to manufacture the vinyl windows to be sold to Home Depot materially inflated the costs incurred by the Company prior to the IPO and otherwise adversely affected Ply Gem's Q2 profit margins and operating results.

53.     Prior to the IPO, Ply Gem's executive management knew of the material, adverse operational issues at the Dallas Plant.  In fact, the President of Ply Gem's W&D segment publicly chastised the Dallas Plant manager, saying words to the effect, if you make me lose this IPO, you'll never work again.  In addition, Ply Gem fired the Vice President in charge of the Dallas Plant.

54.     On the Q2 conference call, Defendant Robinette noted that Ply Gem profitability during Q2 had been adversely impacted by "abnormal inefficiencies due to the ramp up costs" associated with the increase in the number of window units being manufactured, stating, in pertinent part, as follows:

> The expected recovery in the US housing market still represents a significant growth opportunity for Ply Gem, as demonstrated by our window units being up the first half of 2013 by nearly 50%.  However, as we have mentioned in the past, that also brings near-term challenges primarily in the form of labor resource requirements to meet the increasing market demand, as well as a lower end mix of products in this early stage of the recovery.  **Both of these having an unusual effect on our profit performance because of the abnormal inefficiencies due to the ramp up costs** to produce this substantial increase.

55.     Also on the Q2 conference call, Defendant Poe explained that the greater than 15% year-over-year, gross profit margin decline during Q2 was "largely due" to "labor inefficiency and

ramp up costs that were incurred in our US window business" and that "increased costs associated

with the consolidation and startup costs of our production facilities in Dallas, Texas" also adversely

affected Ply Gem's profitability during Q2, stating, in pertinent part, as follows:

> **Our gross profit margin for the second quarter of 2013 was 20.2% as compared to a gross profit margin of 23.9%** [representing a more than 15% decline] **in the same period in 2012.  The reduction in gross profit percentage was largely due to the labor inefficiency and ramp up costs that were incurred in our US window business related to the significant increase in unit volumes** in which we have experienced for the third consecutive quarter of volume increase in excess of 100% on certain product categories. **We also incurred increased costs associated with the consolidation and startup costs of our production facilities in Dallas, Texas**, as well as our enterprise lean initiative, which will lead to improved operating flexibility in the future.

### The Registration Statement Contained Inaccurate Statements of Material Fact and Omitted Material Information Required to Be Disclosed Therein

56.    The Registration Statement was negligently prepared and, as a result, contained

untrue statements of material fact and omitted to disclose material information which was required to

be disclosed pursuant to the regulations governing its preparation.

57.    Item 11 of Form S-1 required the Registration Statement to furnish the information

called for under Item 303 of Regulation S-K [17 C.F.R. §229.303], *Management's Discussion and

Analysis of Financial Condition and Results of Operations* ("MD&A").  As set forth in the

December 29, 2003 interpretative release to Item 303 of Regulation S-K  issued by the SEC (the

"2003 Interpretive Release"), the purpose of MD&A is to provide investors with information

necessary to an understanding of a company's results of operations, including the identification and

disclosure of known trends, events, demands, commitments and uncertainties that are reasonably

likely to have a material effect on a company's operating performance.

58.    The instructions to Item 303(a) of Regulation S-K required that the Registration

Statement provide disclosure about and "focus specifically" on material events that would cause Ply

Gem's reported financial information not to be necessarily indicative of future operating results,

including "matters that would have an impact on future operations and [matters that] have not had an

impact in the past" stating, in pertinent part, as follows:

> The discussion and analysis shall **focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results** or of future financial condition.  **This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past**, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

59.     The 2003 Interpretive Release also provides that the Registration Statement was

required to provide disclosure about known demands, events or uncertainties, except for those that

management determined: (i) were not reasonably likely to occur; or (ii) would not have a material

effect on Ply Gem's operating results.  The 2003 Interpretive Release states, in pertinent part, as

follows:

> As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty **is required unless** a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.

60.     In violation of these disclosure obligations, the Registration Statement negligently

failed to disclose the following known material events and uncertainties that were reasonably likely

to have a material adverse effect on Ply Gem's Q2 gross profit, gross margins, and operating results

as follows:

(a)     that Ply Gem had agreed to buy back significant amounts of window

inventory from Home Depot and the Company had been incurring a substantial loss on the windows;

(b)     that the HD Supply Agreement required that Ply Gem initially sell a large

volume of lower-priced, lower-margin product to Home Depot which would cause the Company's

profit margins to decline; and

(c)     that Ply Gem was experiencing on-going operational inefficiencies and ramp-up costs associated with its W&D business segment which was then having a material adverse effect on the Company's continuing operations and financial results.

61.     In addition to the foregoing, Item 303(a) of Regulation S-K required the Registration Statement to disclose that high customer inventory at the end of the Company's first quarter had adversely affected the demand for and sales of Ply Gem's siding products in April 2013 and May 2013, which was then having a materially adverse effect on the Company's SF&S operations during Q2.

62.     At the time of the IPO, Ply Gem was experiencing declining sales of siding due to customers' high inventory levels.  At the time of the IPO, Defendants knew that siding customers had experienced poor sales in March 2013, were over-inventoried with products and that, as a result, these customers had greatly reduced their purchases in April and May 2013 and would be reducing future purchases.

63.     During the Q2 conference call to discuss the Company's operations, Defendants Robinette and Poe acknowledged that Ply Gem's biggest siding customers told them "March was their worst March in eight years," which, in turn, had a material adverse effect on the Company's SF&S operations during April and May of 2013.   Defendants Robinette and Poe further acknowledged that they knew, based on their prior sales to these customers, that the customers were carrying significant amounts of inventory and would have to reduce purchases in the future.  The following exchange took place:

Defendant Poe:

As many of you are aware, **our vinyl siding sales** are weighted towards repair remodeling market, which as Gary mentioned, was **impacted by sluggish demand during the second quarter due in part from our customers ending the first quarter with higher levels of inventory, thus reducing demand for our products in April and May**.

\*       \*       \*

Michael Rehaut, Analyst, J.P. Morgan:

Okay.  One last one and I'll turn it over to others.  You mentioned in the prepared remarks about the slower sales and demand because of inventory in the channel in April and May.  Any change in those trends in June, if you did -- **if you felt like the excess inventory in the channel perhaps it almost seemed like it was implying that it worked through April and May**.  What -- were there any difference in terms of your sales into the channel in June?

Defendant Poe:

Yes, let me -- let us give you the, I guess the trajectory of the second-quarter build, Michael.  I think that answers it a lot.  First, and **when we talked about that channel inventory, that specifically impacts our Siding, Fence and Stone business, because that's a made-to-inventory product**.  Windows and Doors, there's essentially no inventory there.  So if you were looking at their sales, they were pretty consistent during the quarter, and consistently strong, I might add.  **In Siding**, March was somewhat of a normal month, but that's where the weather impacted our customers**.  April, sales were down 25%**.  May, they were up in the mid-single digits.  June, they were up upper teens.  And so clearly, **it was very clear**.  And our sales to some extent, while we outperformed the VSI, or the vinyl siding industry, they mirrored in terms of the pattern that the industry saw.

Defendant Robinette:

So to add to that, Michael, **our customers in that channel, which are big customers that are well documented, they told us that their March was their worst March in eight years**.  And it wasn't ours.  So we knew that it--

Defendant Poe:

**It was coming**.

Defendant Robinette:

**That it was going to hit and it hit in April.  And maybe it wasn't our worst April in eight years, but it was our worst April in a while**, so as Shawn said . . .

64.     Item 3 of Form S-1 required that the Registration Statement furnish the information called for under Item 503 of Regulation S-K [17 C.F.R. §229.503], including, among other things, a "discussion of the most significant factors that make the offering risky or speculative."

- 16 -

65.     The risk disclosures in the Registration Statement negligently failed to advise investors about significant, then-existing (as opposed to potential) factors that made the IPO speculative or risky.

66.     First, the Registration Statement inaccurately described the ***potential*** risks associated with the loss of, or a reduction in orders from, any significant customers, which "could" cause a decrease in Ply Gem's net income.  The Registration Statement stated, in pertinent part, as follows:

> **Because we depend on a core group of significant customers, our sales, cash flows from operations and results of operations may decline if our key customers reduce the amount of products that they purchase from us**. (Emphasis in the original.)
>
> Our top ten customers accounted for approximately 45.9% of our net sales in the year ended December 31, 2012.  Our largest customer for the fiscal year ended December 31, 2012, ABC Supply Co., Inc., distributes our products within its building products distribution business, and accounted for approximately 10.5% of our consolidated 2012 net sales.  We expect a small number of customers to continue to account for a substantial portion of our net sales for the foreseeable future.
>
> The loss of, or a significant adverse change in our relationships with our largest customer or any other major customer could cause a material decrease in our net sales.  **The loss of, or a reduction in orders from, any significant customers, losses arising from customers' disputes regarding shipments, fees, merchandise condition or related matters, or our inability to collect accounts receivable from any major retail customer <u>could cause</u> a decrease in our net income and our cash flows**.  In addition, revenue from customers that have accounted for significant revenue in past periods, individually or as a group, may not continue, or if continued, may not reach or exceed historical levels in any period.

67.     The statements above were inaccurate statements of material fact because the Registration Statement negligently failed to disclose the significant then-existing, as opposed to potential, risks associated with the reduction of orders by Ply Gem's significant vinyl siding customers.  As noted above, Defendants Poe and Robinette have acknowledged the existence of a previously undisclosed significant risk at the time of the IPO when they admitted Ply Gem's biggest siding customers told them March was their worst March in eight years, which, in turn, had a materially adverse effect on the Company's SF&S operations during April and May of 2013.

- 17 -

68.    In addition, the risk factors noted in the Registration Statement inaccurately described *potential* risks associated with the effects of periodic labor ramp-up costs, which "could" result in a decrease in Ply Gem's short-term earnings, stating, in pertinent part, as follows:

> **Manufacturing or assembly realignments may result in a decrease in our short-term earnings, until the expected cost reductions are achieved, due to the costs of implementation**.  (Emphasis in the original.)

> We continually review our manufacturing and assembly operations and sourcing capabilities.  **Effects of periodic manufacturing realignment, cost savings programs, and labor ramp-up costs <u>could result</u> in a decrease in our short-term earnings until the expected cost reductions are achieved and/or production volumes stabilize**.  Such programs may include the consolidation and integration of facilities, functions, systems and procedures.  Such actions may not be accomplished as quickly as anticipated and the expected cost reductions may not be achieved or sustained.

69.    Further, the risk factors noted in the Registration Statement were materially inaccurate because they described the *potential* risks associated with training additional workforce, which, "if" needed to handle increased volume and production, "could" increase Ply Gem's cost structure and decrease its margins, stating, in pertinent part, as follows:

> **Our ability to operate and our growth potential could be materially and adversely affected if we cannot employ, train and retain qualified personnel at a competitive cost**.  (Emphasis in the original).

> Many of the products that we manufacture and assemble require manual processes in plant environments.  We believe that our success depends upon our ability to employ, train and retain qualified personnel with the ability to design, manufacture and assemble these products. In addition, our ability to expand our operations depends in part on our ability to increase our skilled labor force as the housing market recovers in the United States and Western Canada.  A significant increase in the wages paid by competing employers could result in a reduction of our qualified labor force, increases in the wage rates that we must pay, or both.  **In addition, our ability to quickly and effectively train additional workforce to handle the increased volume and production while minimizing labor inefficiencies and maintaining product quality will be a strategic initiative in a housing market recovery.  <u>If either of these events were to occur</u>, our cost structure could increase, our margins <u>could decrease</u>**, and any growth potential could be impaired.

70.     The statements in ¶¶68 and 69 above were each inaccurate statements of material fact because the Registration Statement negligently failed to disclose the significant then-existing (as opposed to potential) risks associated with the labor inefficiencies and ramp up costs associated with Ply Gem's window business.  After the IPO, during the Q2 conference call to discuss the Company's operations, Defendants Robinette and Poe acknowledged the existence of these previously undisclosed significant risks at the time of the IPO when they explained that labor inefficiencies and ramp-up costs had a material adverse effect on Ply Gem's Q2 operating results, stating, in pertinent part, as follows:

Defendant Robinette:

However, as we have mentioned in the past, that also brings near-term challenges primarily in the form **of labor resource requirements to meet the increasing market demand**, as well as a lower end mix of products in this early stage of the recovery.  Both of these **having an unusual effect on our profit performance because of the abnormal inefficiencies due to the ramp up costs to produce this substantial increase**.

Defendant Poe:

Our gross profit margin for the second quarter of 2013 was 20.2% as compared to a gross profit margin of 23.9% in the same period in 2012.  **The reduction in gross profit percentage was largely due to the labor inefficiency and ramp up costs that were incurred in our US window business related to the significant increase in unit volumes** in which we have experienced for the third consecutive quarter of volume increase in excess of 100% on certain product categories.

71.     Then, in response to questions posed by analysts during the Q&A session of the Q2 conference call, Defendant Robinette acknowledged the undisclosed significant labor related risks were known by Ply Gem and its senior management when he admitted that "we can dictate or we can predict what our labor ramp up is going to be," stating, in pertinent part, as follows:

So, Michael, if you have a basis, and this may help you or it may not help you, but if your Window unit sales are up 10%, you normally throw overtime and a Saturday or Sunday at it.  So you have some inefficiency.  If it's up 20%, you have to put -- bring on shifts and of course the difficulty with that is getting, with the labor pool that's left in this market, you have a churn.  And then if you're up 40% to 50%, you got a

whole different ball game, which is a little bit of a tsunami coming at a plant. I think back to Shawn's point, **we can dictate or we can predict what our labor ramp up is going to be**. But the inefficiency really comes into the whole price mix of our -- in our financial statements.

72.      In fact, while labor inefficiencies and ramp-up costs were then having a material adverse on Ply Gem's Q2 operating results, the Registration Statement inaccurately highlighted Ply Gem's operating platform as one that enabled the Company to "maximize our efficiencies and minimize selling, general, and administrative expenses during the U.S. housing downturn," stating, in pertinent part, as follows:

> _Highly Efficient, Low Cost Operating Platform_. Since mid-2006, we have closed or consolidated eight plants, generating savings of over $30 million annually, and significantly reduced our workforce. Since 2006, we also invested approximately $98.3 million in capital expenditures, including new product introductions and upgrades to equipment, facilities and technology, to continue improving our vertically integrated manufacturing platform. For example, our multi-plant window manufacturing platform allows us to service our customers with minimal lead times across a broad geographic coverage area, providing us a competitive advantage with the ability to operate in just-in-time fashion. This capability provides a unique service proposition to our customers while allowing us to maintain minimal inventory levels in our window product offerings. In addition, as a result of our Poly vinyl Chloride (PVC) resin purchasing scale (we are one of the largest purchasers in North America based on industry estimates), we are able to secure favorable prices, terms and input availability through various cycles. Furthermore, since 2008, we have centralized numerous back office functions to our corporate office that previously resided in our business segments. **This enabled us to maximize our efficiencies and minimize selling, general, and administrative expenses during the U.S. housing downturn**.

> Through our strong cost controls, vertically-integrated manufacturing platform, continued investment in technology, focus on safety and significant purchasing scale, **we have improved efficiency in our manufacturing facilities while maintaining a low fixed cost structure** of approximately 21% of our total cost structure, which provides significant operating leverage as the housing market recovers. Furthermore, our manufacturing facilities are among the safest in North America with four of them having received the highest federal, state and/or provincial safety award and rating. **We believe that we have one of the most efficient and safest operating platforms in the exterior building products industry**, helping to drive our profitability. (First emphasis in the original).

- 20 -

73.     In addition to the foregoing, the "risk" disclosures in the Registration Statement were not meaningful and/or failed to advise investors in the IPO about the then-existing risk associated with the Company's limited understanding of and visibility into products demanded by home builders.

74.     After the IPO, on the Q2 conference call to discuss the Company's operations, Defendant Poe acknowledged the existence of a previously undisclosed significant risk when he explained that a lack of visibility into the builder market created cost inefficiencies, stating, in pertinent part, as follows:

Defendant Poe:

**So I think we've got to get back to a process where we as a Company** -- so a part of enterprise lean, we are redesigning our S&OP to **have complete visibility into the builder**, which is not our customer, **so that we can see what's coming at us so that we can prepare and manufacture products that are standard in advance**.

And I'll give you an example.  In Dallas, we knew we were getting this Home Depot business.  We knew what the product that was coming at us.  We were delivering 8,000, 9,000 units a week with no ramp up issues because we knew it was a standard product.  **So I think that's the other piece, a complete visibility into the builder**.  I think that'll help the lumber yard chain as well, because it comes at them.  These volumes came at them and they just pass it on to us.  So those are the two things we're really working **that in the future will help us abate a tremendous amount of this inefficient costs that we have**.

75.     On May 19, 2014, the date the Initial Complaint in this action was filed with this Court, Ply Gem common shares closed at $11.83 per share, or approximately 44% less than the IPO price.

## COUNT I

### Violations of Section 11 of the Securities Act
### (Against All Defendants)

76.     Lead Plaintiff repeats and re-alleges each and every allegation contained above.

77.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.  For purposes of this Count, Lead Plaintiff does not claim that Defendants engaged in intentional or reckless misconduct or that Defendants acted with fraudulent intent.

78.     The Registration Statement was inaccurate and contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not inaccurate, and omitted to state material facts required to be stated therein.

79.     Ply Gem was the registrant for the IPO.  As the issuer of its common stock, Ply Gem is strictly liable to Lead Plaintiff and the Class for the materially inaccurate statements in the Registration Statement and the failure of the Registration Statement to be complete and disclose the material information required pursuant to the regulations governing its preparation.

80.     The Individual Defendants signed the Registration Statement either personally or through an Attorney-in-Fact and caused its issuance.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  The Individual Defendants had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements in the Registration Statement inaccurate.  By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained inaccurate misrepresentations and/or omissions of material fact.  As such, the Individual Defendants are strictly liable to Lead Plaintiff and the Class.

81.     The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement for the IPO was prepared properly and accurately.  The Underwriter Defendants' failure to conduct

an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.  As such, the Individual Defendants are strictly liable to Lead Plaintiff and the Class.

82.     The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.  None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not inaccurate.  By reasons of the conduct herein alleged, each Defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

83.     At the time of their purchases of Ply Gem common shares, Lead Plaintiff and the other members of the Class were without knowledge of the facts associated with the wrongful conduct alleged herein.  As a result of Defendants' violations, the value of Ply Gem common shares has declined substantially and therefore Lead Plaintiff and the Class have sustained damages.

## COUNT II

### Violation of Section 12(a)(2) of the Securities Act
### (Against All Defendants)

84.     Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

85.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of Lead Plaintiff and the Class, against all Defendants.  For purposes of this Count, Lead Plaintiff affirmatively states that it does not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

86.     Defendants were sellers and offerors and/or solicitors of purchasers of the securities offered pursuant to the Registration Statement and Prospectus.  Defendants issued, caused to be issued and/or signed the Registration Statement in connection with the IPO.  The Registration

Statement contained a Prospectus that was used to induce investors, such as Lead Plaintiff and the other members of the Class, to purchase the stock offered by Ply Gem.

87.     The Underwriter Defendants participated in the preparation and dissemination of the defective and inaccurate Prospectus for their own financial benefit.  But for their participation in the IPO, including their solicitation as set forth herein, the IPO could not and would not have been accomplished.  Specifically, the Underwriter Defendants:

(a)     made the decision to conduct the IPO and do it at the price set forth in the Prospectus.  The Underwriter Defendants drafted, revised and/or approved the Prospectus and participated in its being declared effective by the SEC.  The Prospectus was calculated to create interest in Ply Gem common stock and was widely distributed by or on behalf of the Underwriter Defendants for that purpose; and

(b)     conceived and planned the IPO and orchestrated all activities necessary to affect the sale of this stock to the investing public, by issuing stock, promoting the stock and supervising their distribution and ultimate sale to the investing public.

88.     As set forth above, the Registration Statement and Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.  Defendants' actions of solicitation included preparing the defective and inaccurate Prospectus and participating in efforts to market the IPO to investors.

89.     Defendants owed to the purchasers of Ply Gem stock, including Lead Plaintiff and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus and to ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact.  Defendants, in

the exercise of reasonable care, should have known that the Registration Statement and Prospectus contained misstatements and omissions of material fact.

90.     Lead Plaintiff and the other members of the Class purchased or otherwise acquired Ply Gem common stock pursuant to the Registration Statement and Prospectus, and neither Lead Plaintiff nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in the Registration Statement and Prospectus.

91.     By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the Securities Act.  Accordingly, Lead Plaintiff, individually and on behalf of the Class, hereby offers to tender to Defendants those shares of stock that Lead Plaintiff and the other Class members continue to own, in return for the consideration paid for those shares together with interest thereon.  Class members who have sold their shares are entitled to rescissory damages.

## COUNT III

### Violation of Section 15 of the Securities Act
### (Against the Individual Defendants)

92.     Lead Plaintiff repeats and re-alleges each and every allegation contained above.

93.     This Count is asserted by Lead Plaintiff against all the Individual Defendants for violations of Section 15 of the Securities Act.  For purposes of this Count, Lead Plaintiff does not claim that the Individual Defendants engaged in intentional or reckless misconduct or that the Individual Defendants acted with fraudulent intent.

94.     The Individual Defendants acted as controlling persons of Ply Gem within the meaning of Section 15 of the Securities Act.  By reason of their ownership interest, senior management positions and/or directorships at the Company, the Individual Defendants individually, and acting pursuant to a common plan, had the power to influence and exercised the same to cause

Ply Gem to engage in the conduct complained of herein and were therefore control persons of Ply Gem. By reason of such conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act.

95.     Each of the Individual Defendants was a culpable participant in the violation of Section 11 of the Securities Act alleged in Count I above, based on their having signed the Registration Statement and/or having otherwise participated in the process which allowed the IPO to be successfully completed.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative and Lead Counsel as Class Counsel;

B.     With respect to Count II, ordering that the IPO be rescinded;

C.     Awarding Lead Plaintiff and other members of the Class damages together with interest thereon;

D.     Awarding Lead Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.     Awarding Lead Plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED:  December 15, 2014                    ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                             SAMUEL H. RUDMAN
                                             DAVID A. ROSENFELD


                                                  */s/ Samuel H. Rudman*
                                             SAMUEL H. RUDMAN

                                             58 South Service Road, Suite 200
                                             Melville, NY  11747
                                             Telephone:  631/367-7100
                                             631/367-1173 (fax)
                                             srudman@rgrdlaw.com
                                             drosenfeld@rgrdlaw.com

                                             ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                             MARK SOLOMON
                                             655 West Broadway, Suite 1900
                                             San Diego, CA  92101-8498
                                             Telephone:  619/231-1058
                                             619/231-7423 (fax)
                                             marks@rgrdlaw.com

                                             *Lead Counsel*

- 27 -

<u>CERTIFICATE OF SERVICE</u>

     I, Samuel H. Rudman, hereby certify that on December 15, 2014, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.


                                             */s/ Samuel H. Rudman*
                                          SAMUEL H. RUDMAN