```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
IN RE PLY GEM HOLDINGS, INC.                                :   14-CV-3577 (JPO)
SECURITIES LITIGATION                                       :
                                                            :   OPINION AND ORDER
------------------------------------------------------------X
```

J. PAUL OETKEN, District Judge:

Defendants Ply Gem Holdings, Inc. ("Ply Gem" or the "Company"), Gary E. Robinette, Shawn K. Poe, Frederick J. Iseman, Robert A. Ferris, Steven M. Lefkowitz, John D. Roach, Michael P. Haley, Timothy T. Hall, Jeffrey T. Barber, J.P. Morgan Securities LLC, Credit Suisse Securities (USA) LCC, Goldman, Sachs, & Co., UBS Securities LLC, Deutsche Bank Securities Inc., Zelman Partners LLC, BB&T Capital Markets, and Stephens Inc. (collectively "Defendants"), have moved to dismiss this putative federal securities class action pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 44, "Mot. Dismiss.")

For the reasons that follow, Defendants' motion to dismiss is granted.

**I.     Background**

On December 15, 2014, lead plaintiff the Strathclyde Pension Fund ("Plaintiff") filed the Complaint on behalf of all who purchased common shares of Ply Gem in connection with the Company's May 23, 2013 initial public offering ("IPO"). The Complaint alleges that Defendants violated sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77*l* (a)(2), 77*o*. (*See* Dkt. No. 41, "Complaint" ¶ 1.)

Because Defendants have moved to dismiss under Rule 12(b)(6), the following facts are drawn from the Complaint and assumed true. *See Slayton v. Am. Express. Co.*, 604 F.3d 758, 766 (2d Cir. 2010). In addition to the allegations on the face of the Complaint, the Court considers "documents incorporated into the [C]omplaint by reference, and matters of which a

court may take judicial notice," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), including information from Ply Gem's filings with the Securities and Exchange Commission ("SEC"). *See ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d. Cir. 2007).

Ply Gem is a manufacturer of building products, such as windows, doors, and siding. (Compl. ¶¶ 2, 34-36.) On May 22, 2013, the SEC declared effective the Company's Form S-1 Registration Statement (the "Registration Statement"), which incorporated the Prospectus, in connection with Ply Gem's IPO. (*Id.* at ¶¶ 3-4.) The next day, Ply Gem sold 18,157,895 shares of common stock to the public at a price of $21.00. (*Id.* at ¶ 4.) By the time the initial complaint in this consolidated case had been filed, the value of Ply Gem stock had fallen to $11.83 per share. (*Id.* at ¶ 10.)

Plaintiff alleges that material information was omitted from, or misstated in, Defendants' Registration Statement and Prospectus. (*Id.* at ¶ 5-9.) Much of the controversy concerns a supply agreement that Ply Gem and The Home Depot, Inc. ("Home Depot") entered into in late 2012, in which Ply Gem agreed to manufacture and supply windows to 300 Home Depot stores. (*Id.* at ¶ 8.) Plaintiff points to four main deficiencies in Defendants' public disclosures: (1) failure to disclose the cost of a "buyback" provision in the Home Depot supply agreement; (2) failure to disclose that the agreement involved the sale of a large volume of low-margin windows; (3) failure to disclose production problems and increased costs associated with ramping up production of windows for sale to Home Depot; and (4) failure to disclose that siding customers had experienced poor sales in March 2013 and were "over-inventoried." (*Id.* at ¶¶ 6-9.) A summary of these allegations follows.

### A. The Buyback Program

According to Plaintiff, Defendants did not disclose that the Home Depot agreement included a "buyback" provision requiring the Company to purchase a "certain amount of Home Depot's existing window inventory." (*Id.* at ¶ 41.) As a result of the provision, Ply Gem incurred "material costs" stemming from the purchase and subsequent "transportation, warehousing and labor." (*Id.* at ¶ 43.) So many windows were purchased from Home Depot, alleges Plaintiff, that a Ply Gem warehouse received "approximately five to six tractor trailer loads of windows per day, seven days per week." (*Id.* at ¶ 41.) So many of the windows ended up as scrap that the "Company had difficulty procuring dumpsters sufficient to accommodate" them. (*Id.* at ¶ 43.) As evidence that the buyback program resulted in material costs, Plaintiff points to statements made on August 13, 2013, when Ply Gem held a conference call to discuss its financial results for the 2013 fiscal second quarter ("Q2" and the "Q2 call"). On the Q2 call, Defendant Robinette stated that the buyback was "really a one-time cost that . . . affect[s] the margins on the quarter by . . . a full . . . 100 basis points. So it represents about 20% to 25% of that margin compression in the Window and Door segment." (*Id.* at ¶ 45.)

### B. Low-Margin Window Sales

Defendants did not disclose that the supply agreement obligated Ply Gem to sell Home Depot "a large volume of low-margin aluminum windows." (Compl. ¶ 46.) The resulting increase in the percentage of the Company's sales attributable to low-margin products had, Plaintiff alleges, a material adverse effect on Ply Gem's Q2 results. (*Id.*) During the Q2 conference call, Defendant Poe noted that the "initial rollout" to Home Depot involved a "lower margin product" which accounted for "some of" the Company's increase in low-margin sales.

(*Id.* at ¶ 47.)  Defendant Robinette stated that the Home Depot rollout "played havoc with [the Company's] mix."  (*Id.*)

      **C.**    **Ramp-Up Costs**

As part of its agreement with Home Depot, Ply Gem also increased production of vinyl windows.  (*Id.* at ¶ 48.)  Plaintiff alleges that the Company failed to disclose "significant, ongoing operational inefficiencies associated with the ramping [up] of Ply Gem's process to manufacture the vinyl windows" at its plant in Dallas, Texas — inefficiencies that resulted in material costs.  (*Id.*)

The process of preparing the Dallas facility to produce vinyl windows was "from the on-set . . . dysfunctional," "behind schedule and millions of dollars over budget."  (*Id.* at ¶ 49.)  The plant "began operating prior to securing requisite occupancy approvals from local authorities and without necessary manufacturing equipment," which "amplified the costs" of production.  (*Id.* at ¶ 50.)  Without the needed equipment, the Company was "forced to buy window panes" from another company "at a steep premium."  (*Id.*)  The plant also "utilized a new workforce of relatively inexperienced employees," exacerbating costs.  (*Id.* at ¶ 51.)

According to Plaintiff, Ply Gem's management had knowledge of these operational issues prior to the IPO.  (*Id.* at ¶ 53.)  Management fired the Vice President in charge of the plant and "publicly chastised the Dallas Plant manager, saying words to the effect [of], if you make me lose this IPO, you'll never work again."  (*Id.*)  For further evidence that the ramp-up costs were material, Plaintiff points to the Q2 call.  On the call, Defendant Poe explained that the "gross profit margin for the second quarter of 2013 was 20.2% as compared to a gross profit margin of 23.9% . . . in the same period of 2012 . . . largely due to the labor inefficiency and ramp up costs that were incurred."  (*Id.* at ¶ 55.)  He also stated that the Company "incurred increased costs

associated with the consolidation and startup costs of our production facilities in Dallas, Texas" as well as another initiative. (*Id.*)

### D.     Declining Sales

Finally, the Complaint alleges that Defendants did not disclose a materially significant drop in demand for siding products prior to the IPO. (*Id.* at ¶ 62.) According to Plaintiff, "Defendants knew that siding customers had experienced poor sales in March 2013, were over-inventoried with products and . . . as a result, these customers had greatly reduced their purchases in April and May 2013 . . . ." (*Id.*) During the Q2 call, Defendants Robinette and Poe stated that customers had "told [Ply Gem] that their March was their worst March in eight years" and so the Company "knew" that it would face reduced demand in April. (*Id.* at ¶ 63.) Defendant Poe noted that "the weather impacted our customers" in March, so that in "April, sales were down 25%." (*Id.*) But by "May, [sales] were up [by a percentage] in the mid-single digits" and in "June they were up [by a percentage in the] upper teens." (*Id.*)

### E.     Defendants' Motion

On February 13, 2015, Defendants filed this motion to dismiss. The motion argues that Plaintiff's Complaint should be dismissed for three reasons: (1) "Ply Gem did disclose most of the issues purportedly omitted in the Registrations Statement and earlier filings"; (2) "the Complaint fails to allege facts showing Defendants knew of the issue at the time of the IPO or that Defendants reasonably expected the issue to be material to Ply Gem's results"; and (3) "the Complaint does not, and cannot, show that the purported omissions were material." (Mot. Dismiss at 2.)

**II.     Discussion**

"To survive a motion to dismiss, a complaint must plead enough facts to state a claim to relief that is plausible on its face." *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 715 (2d Cir. 2011) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Because Plaintiff expressly disclaims any claims of fraud, these claims are not subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Rombach v. Chang*, 355 F.3d 164, 171-72 (2d Cir. 2004); *see also Hutchison v. Deutsche Bank Securities Inc.*, 647 F. 3d 479, 484 (2d Cir. 2011). Neither do the heightened standards of the Private Securities Litigation Reform Act apply. *See Panther Partners Inc. v. Ikanos Commc'ns., Inc.*, 681 F.3d 114, 120 (2d Cir. 2012). Thus, "this is an ordinary notice pleading case, subject only to the 'short and plain statement' requirements of Federal Rule of Civil Procedure 8(a)." *Litwin*, 634 F.3d at 715.

Plaintiff's claims are rooted in sections 11, 12(a)(2), and 15 of the Securities Act. Section 11 imposes strict liability on certain participants in a registered securities offering if "any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 12(a)(2) imposes similar liability on sellers of securities for misstatements or omissions in a prospectus. *Id.* at § 77*l*(a)(2). Section 15, in turn, imposes liability on those who "control[] any person liable" under sections 11 and 12. *Id.* at § 77*o*. For present purposes, Plaintiff's claims under sections 11, 12, and 15 can be considered together.

6

Plaintiff primarily relies on Item 303 of SEC Regulation S-K to show that Defendants failed to meet their disclosure obligations.  17 C.F.R. § 229.303.  Under Item 303(a)(3)(i), a registrant must disclose "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations."  *Id.*  Pursuant to Item 303(a)(3)(ii), a registrant must disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material or unfavorable impact on net sales or revenues or incomes from continuing operations."  *Id.*  The instruction applicable to both provisions states that "discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported information not to be necessarily indicative of future operating results or of future financial condition."  17 C.F.R. § 229.303(a) instruction 3.  The SEC's interpretive release regarding Item 303 further explains that a "disclosure duty exists where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operation."[1] *See Litwin*, 634 F.3d at 716; *Panther Partners*, 681 F.3d at 120.

A.   **Materiality**

In order to survive this motion to dismiss, Plaintiff must plead factual allegations sufficient to sustain the conclusion that the omissions in question were "'reasonably likely' to be material for the purpose of Item 303."  *Litwin*, 634 F.3d at 716.  The materiality requirement is

---

[1] The Interpretive Release construes Item 303 to include an obligation to disclose a "trend, demand, commitment, event or uncertainty." Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures, Securities Act Release No. 6835, Exchange Act Release No. 26831, Investment Company Act Release No. 16961, 43 SEC Docket 1330 at *4 (May 18, 1989) (hereinafter "Interpretive Release").  Accordingly, the Court declines to parse the difference between "trends" and "uncertainties," in 303(a)(3)(ii) and "events," "transactions" and "changes" in 303(a)(3)(i).

7

satisfied when a plaintiff alleges "a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161. "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). At this stage, a "complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino*, 228 F.3d at 162 (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

Materiality is an "inherently fact-specific finding," *Basic*, 485 U.S. at 236, which defies "formulaic" assessment, *Ganino*, 228 F.3d at 162. "A court must consider both quantitative and qualitative factors in assessing an item's materiality and that consideration should be undertaken in an integrative manner." *Litwin*, 634 F.3d at 717 (citation omitted). Although it is no substitute for this flexible and context-dependent inquiry, the Second Circuit has endorsed the use of SEC Staff Accounting Bulletin No. 99, 64 Fed.Reg. 45150 (1999) (hereinafter "SAB No. 99"), as "relevant guidance for the assessment of materiality." *Litwin*, 634 F.3d at 717; *see Ganino*, 225 F.3d at 163-64. SAB No. 99 provides that "[t]he use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that . . . a deviation of less than the specific percentage with respect to a particular item . . . is unlikely to be material." *Id.* at *45151. However, even a deviation less than 5% may be material if other factors are present, such as where the misstatement "involves concealment of an unlawful transaction," "masks a change in earnings," or "changes a loss into income." *Id.* at *45152.

For the reasons that follow, the Complaint fails to plead facts sufficient to permit the conclusion that the alleged omissions were "reasonably likely to be material" at the time of the IPO.[2] *Litwin*, 634 F.3d at 716.  Plaintiff's four allegations are considered in turn.

### 1. The Buy-Back Program

Plaintiff's first allegation is that Defendants should have disclosed the buyback provision in the agreement between Ply Gem and Home Depot.  The Complaint alleges that the buyback provision required Ply Gem to purchase so many windows that it needed "approximately five to six tractor trailer loads of windows per day, seven days per week" to carry them and that the Company had "difficulty procuring [sufficient] dumpsters."  (Compl. ¶¶ 41, 43.)  Without additional factual context — such as the value of the windows purchased, the costs of transportation and disposal, or some indication that buybacks are not a routine feature of the Company's business or industry practice — the pleading offers no basis upon which to assess the materiality of its allegations.  *See In re Lone Pine Resources, Inc.*, 2014 WL 1259653, *4 (S.D.N.Y. Mar. 27, 2014) ("[T]he Amended Complaint pleads no facts establishing that the omission . . . had any quantitative impact on the financial information reported in the Prospectus, let alone one of 5% or more."); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008) (finding that the pleadings "offer no possibility at all of assessing the materiality as a matter of law.")  Assessing the materiality of the buyback provision based on these allegations is like trying to guess the number of jellybeans in a jar after being told only that the jar is "big."

---

[2] Because it deems the pleading's central claims inadequate on the ground of materiality, the Court does not decide whether the Complaint fails to adequately allege the requisite knowledge under Item 303 or whether Defendants adequately disclosed the alleged omissions. (*See* Mot. Dismiss 2.)  Likewise, the Court need not address Defendants' argument that Plaintiff's essentially derivative Section 12(a)(2) and Section 15 claims are separately deficient.  (*See* Mot. Dismiss 23-24.)

While Plaintiff alleges that the Home Depot supply agreement was, itself, worth some "$40 million to $50 million of incremental business" to the Company, the value of the entire agreement suggests nothing about the cost of the buyback provision.  (Compl. ¶ 40.)  The closest the Complaint comes to meaningfully situating the cost of the buyback program in the context of the Company's finances is its reference to the statement in the Q2 call that the program led to a reduction "in the margin on the quarter by . . . a little over a full 100 basis points." (*Id.* at ¶ 45.) The Complaint does not contextualize this number and the briefing sheds little additional light. The Court assumes that this statement means that the buyback program led to a roughly 1% decrease in the Company's quarterly gross profit margin.  Even if profit margin is the appropriate denominator for evaluating the cost of the buyback program, a 1% decrease is far below the 5% guidepost set out in SAB No. 99.  *See Hutchison*, 647 F.3d at 489 n.5 ("$30.4 million . . . out of a total investment portfolio of $1.1 billion falls well short of SAB No. 99's 5% threshold and it therefore presumed to be quantitatively immaterial."); *ECA & Local 134 IBEW Joint Pension Trust v. J.P. Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009) ("[A]n alleged misrepresentation relating to less than two percent of defendant's assets, when taken in context, could be immaterial as a matter of law."); *In Re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F.Supp.2d 406, 422-23 (S.D.N.Y. 2013) ("Where misstatements implicate less than 5% of an entity's revenue, the misstatements are not likely to be material.").  Measured against the 5% threshold, the cost of the buyback program alleged in the Complaint falls short of materiality.

Although this Rule 12(b)(6) motion is decided based only on those facts alleged in the Complaint or incorporated by reference, *see Tellabs*, 551 U.S. at 322, the parties also dispute how a fact outside the Complaint — the $2.2 million reported cost of the buyback in Q2 — bears on the question of materiality.  Defendants contend that the total cost of the buyback program in

Q2 was $2.2 million. (Mot. Dismiss at 11.) This cost would amount to "only 1.3% of total net sales reported by Ply Gem's Windows segment for the quarter ($168.9 million) and 0.6% of total net sales for the Company for the quarter ($368.1 million)" — well below the SAB No. 99 threshold. (*Id.*) Plaintiff, on the other hand, argues that the $2.2 million should be compared to Ply Gem's $662,000 in "operating earnings (income)" rather than sales or revenue. (Dkt. No. 46, "Opp'n" at 16.)[3] "[O]perating earnings would have been . . . 332.33% higher" if Ply Gem had not incurred the $2.2 million expense. (*Id.* at 17.)

In other words, even assuming that the parties agree on the numerator — the $2.2 million buyback program cost — they disagree about the appropriate denominator. There is no hard and fast rule about what financial metrics to use as a basis for comparison when assessing materiality. *See Ganino*, 228 F.3d at 165 ("[I]tems in issue should be compared to like items on the corporate financial statement."); SAB No. 99 at *45153 n. 24 ("The particular items in the financial statements to be considered as a basis for the materiality determination depend on the proposed adjustment to be made and other factors . . . ."). But the Court cannot adopt Plaintiff's suggestion that the buyback program should be compared to operating earnings. Doing so would mean that any cost exceeding $33,100 (which is 5% of $662,000) would presumptively be subject to disclosure under SAB. No 99. The purpose of the Securities Act is not to "bury the shareholders in an avalanche of trivial information." *Basic*, 485 U.S. at 231.

Of course, the materiality inquiry is both quantitative and qualitative. *Litwin*, 634 F.3d at 717. In addition to its 5-percent threshold, SAB No. 99 contains an illustrative list of circumstances which could "render material a quantitatively small" omission. SAB No. 99 at *45152. *See Hutchison*, 647 F.3d at 489-90. Plaintiff has not cited any qualitative factors that it

---

[3] Plaintiff also suggests that the $2.2 million figure may understate the total cost of the buyback program. (Opp'n at 16 n.7.)

believes support a finding of materiality.  Nor does the Complaint allege facts comparable to the circumstances outlined in SAB No. 99.  On these allegations, there is no basis on which to conclude that the cost of the buyback program was more likely to be material than the quantitative analysis suggests.

### 2. Low-Margin Window Sales

Plaintiff's second claim suffers from the same defect.  Plaintiff alleges that Defendants should have disclosed that the supply agreement obligated Ply Gem to sell Home Depot a large volume of low-margin windows.  According to the Complaint, the "initial rollout" to Home Depot involved a "lower margin product" which accounted for "some of" the Company's increase in low-margin sales.  (*Id.* at ¶ 47.)  In its papers, Plaintiff suggests that Defendant "Poe admitted that the sale of low-end aluminum windows negatively impacted Ply Gem's Q2 profitability by approximately $8 million, an indisputably material amount given Ply Gem's Q2 operating earnings of only $662,000."  (Opp'n at 19 n.11.)  But the statement cited in the Complaint indicates that only "some" of the increase in volume was attributable to Home Depot.  (Compl. ¶ 47.)  Plaintiff concedes that "the sales of aluminum windows to Home Depot" may have been "responsible for only a small percentage of the $8 million impact," but suggests that the impact of window sales is nonetheless material when compared to the Company's $662,000 in operating income.  (Opp'n at 19 n.11.)

Because the Complaint suggests little more than "some" role for the Home Depot agreement in the Company's diminished quarterly profitability, it fails to plausibly allege that the undisclosed information was likely to be material.  Notably, even if all $8 million of the alleged impact were attributed to the sale of low-margin windows to Home Depot, that figure would fall

below SAB No. 99's 5% threshold when compared to the quarterly total net sales of $368.1 million.  (Dkt. No. 45-7, "Q2 Earnings Call Transcript" at 2).[4]

### 3. Ramp-Up Costs

Plaintiff alleges that the Company failed to disclose "significant, ongoing operational inefficiencies associated with the ramping [up] of Ply Gem's process to manufacture the vinyl windows" at its plant in Dallas, Texas — inefficiencies that resulted in material costs.  (Compl. ¶ 48.)  The Dallas plant was, according to Plaintiff, "dysfunctional" and "millions of dollars over budget."  (*Id.* at ¶ 49.)  It operated without "requisite occupancy approvals" and "without necessary manufacturing equipment."  (*Id.* at ¶ 50.)  The Company "was forced to buy window panes . . . at a steep premium," it "produced a large volume of defective windows," and the costs of producing windows were generally "inflated."  (*Id.* at ¶¶ 50-52.)

Allegations of "steep" costs and "large" volumes offer little basis upon which to assess the materiality of the alleged omission.  The closest the Complaint comes to situating the Dallas plant's issues within the context of the Company's finances is its claim, drawn from the Q2 conference call, that the "gross profit margin for the second quarter was 20.2% as compared to a gross profit margin of 23.9% . . . in the same period of 2012" which "was largely due to the labor inefficiency and ramp up costs," including costs associated with the Dallas plant and the Company's "enterprise lean" initiative.  (*Id.* at ¶ 55.)  At most, the selected statement indicates that the reduction in gross profit was *primarily* due to labor and ramp-up costs in the US window business, and that the Dallas plant contributed to those costs.  Even if the entire decline in gross profit margin could be attributed to problems at the Dallas plant, the Court could not — without some explanation — adopt gross profit margin as the appropriate metric with which to assess the

---

[4] Because the Complaint relies heavily on the Q2 Earnings Call Transcript, the Court deems the transcript incorporated by reference.  *See Tellabs*, 551 U.S. at 322.

materiality of the Dallas plant's costs under the SAB No. 99 framework. Plaintiff provides no indication why these costs should be considered in terms of gross profit margin. *See Ganino*, 228 F.3d at 165 ("[I]tems in issue should be compared to like items on the corporate financial statement."). Nor is it clear why the Court should follow Plaintiff's invitation and consider the decline from 23.9% to 20.2% a "15% decline" — adopting relative rather than absolute percentage change as the appropriate yardstick under SAB No. 99. (*See* Compl. ¶ 55.)

Instead, Plaintiff points to a fact outside the Complaint to substantiate its pleading. Defendants state that Q2 costs associated with the Dallas plant were "approximately $0.5 million." (Mot. Dismiss. 17.) Plaintiff, in turn, argues that "in the context of Ply Gem's Q2 operating earnings of $662,000, these costs were indisputably material." (Opp'n at 21.) For the reasons already stated, the Court declines to adopt operating earnings as the pertinent guidepost.

### 4. Declining Sales

Finally, the Complaint alleges that Defendants did not disclose a materially significant drop in demand for siding products in the month of April, prior to the IPO. (*Id.* at ¶ 62.) According to Plaintiff, "Defendants knew that siding customers had experienced poor sales in March 2013, were over-inventoried with products and . . . as a result, these customers had greatly reduced their purchases in April and May 2013." (*Id.* at ¶ 62.) Because "weather impacted [Ply Gem] customers" in March, April siding sales were down "25%." (*Id.* at ¶ 63.)

Here too, the Complaint fails to situate the alleged omission — a one-month decline in siding sales — within the context of Ply Gem's finances so that a reasonable mind could conclude it was likely to be material at the time of the IPO. On the same call cited by Plaintiff, Company representatives noted that, following the April decline, sales increased in May and that June sales were up 17%. (Q2 Earnings Call Transcript at 10.) It is further explained that "the

14

bulk" of weather-related declines in sales result in *deferred* rather than lost sales, and that the sales spike in June was an "example" of such a rebound following the April decline. (*Id.*)  In other words, the call explains why a one-month, weather-related drop in sales may be unlikely to have a material effect on the Company's quarterly finances.  Underscoring this point, the parties agree that net sales on the second quarter were down only 1.4% from the same quarter the previous year.  (*See* Mot. Dismiss at 18-19; Opp'n at 22.)  Aside from this question of materiality, the Court observes that because Ply Gem's Registration Statement is replete with discussion of the seasonal and weather-dependent nature of its business, Defendants may well have satisfied their duty to disclose in the IPO-related public filings (*See e.g.*, Dkt. No. 45-5 at 53-54, 59-60, 69.)

      **B.**    **Plaintiff's Related Claims**

In addition to its Item 303 claims, Plaintiff contends that Defendants breached a duty of disclosure under Item 503(c) of Regulation S-K.  (*See* Compl. ¶ 64 (citing 17 C.F.R. § 229.503).)  Item 503 requires, "where appropriate[,] . . . a discussion of the most significant factors that make the offering speculative or risky."  17 C.F.R. § 229.503(c).  Plaintiff's arguments under Item 503 are derivative of its Item 303 claims.  (Opp'n at 23-24; Compl. ¶¶ 66-74.)  Plaintiff does not adequately plead that the omissions in question are "the most significant factors" that made the offering "speculative or risky" under Item 503 for the same reason that its Item 303 claims fall short of materiality.  *See Hutchison*, 647 F.3d at 484 n.4 ("[T]o the extent we conclude . . . financial difficulties prior to the IPO did not constitute facts 'reasonably likely' to be material under Item 303, we similarly conclude that they were not among 'the most significant factors' rendering [the] IPO 'speculative or risky.'"); *City of Roseville Emp. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011) ("Although there is scant

caselaw on Item 503 . . . courts typically analyze the sufficiency of Item 503 disclosures with the familiar materiality standard."). Plaintiff appears to concede that the question of materiality under Item 303 and the Item 503 inquiry are, in this respect, the same. (*See* Opp'n at 24 n.15.)

To the extent that the Complaint separately alleges that Defendants violated an independent duty to "tell the whole truth" once "a company speaks on an issue or topic," it similarly falters on the issue of materiality. *Meyer v. Jinkosolar Holdings Co. Ltd.*, 761 F.3d 245, 250-51 (2d Cir. 2014) ("[T]he misleading omission must be material.")

### C. Leave to Amend

Plaintiff has requested that it be given leave to amend its complaint in the event of dismissal. (Opp'n at 25 n.19.) The Court is mindful that this is Plaintiff's first amended complaint in this matter. A "court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a). Because Plaintiff's pleading is deemed deficient on grounds that could conceivably be remedied with amendment, the request for leave to amend is granted.

## III. Conclusion

For the foregoing reasons, Defendants' motion to dismiss for failure to state a claim is GRANTED. Plaintiff's request for leave to file an amended complaint is also GRANTED. If Plaintiff wishes to file a second amended complaint, it must do so on or before October 28, 2015.

The Clerk of the Court is directed to close the motion at docket number 43.

SO ORDERED.

Dated: September 29, 2015
New York, New York

J. PAUL OETKEN
United States District Judge